OWEN CUMMINGS, petitioner-appellant, petitioner-respondent,

*v.*

SADIE CUMMINGS, defendant-respondent, defendant-appellant.

[Submitted May 29th, 1931.   Decided February 1st, 1932.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who filed the following opinion:

"The parties were married in 1917.   The defendant left her husband in 1923 because of his alleged cruel conduct. He charges her with adultery with one Grimm, August 7th and 24th, 1924, and by an amended petition charges her

with adultery *pentente lite* with one Young, July 26th, August 28th, August 30th, September 19th and 20th, October 26th, November 7th, December 13th, 1925, and January 10th, 1926. The wife counter-claims charging extreme cruelty.

"The Grimm charge: Cummings testified he saw his wife on a safety isle on Broad street below Market street, Newark, waiting for a trolley August 6th, in the evening, where she was joined by Grimm. He hired a nearby taxicab driver, Daly, and they followed them to Dreamland Park. Daly, the driver, testified to seeing the two at the isle, on the trolley and at the park; that he went into the park at Cummings' request and found them at an orangeade stand, where he says he too, stood and took a 'good look' at them; that he re-ported to Cummings and was discharged. Cummings waited. When Mrs. Cummings and Grimm left the park, towards midnight, Cummings hired another taxicab in which he followed them. The driver, Marinella, testified, as did Cummings, that the two got off the trolley at Broad and Market and went to the World Restaurant, upstairs. He went up, saw them and waited. Shortly after, they took a trolley at Broad and Market and got off in Belleville, near Mrs. Cummings' home. He says they stood at a tree in the dark embracing and kissing and hugging, or might have been; that they then disappeared into a vacant lot, emerging twelve or fifteen minutes afterwards, adjusting their clothing. This was after two in the morning. The two taxicab drivers were accidental witnesses of what they testified to and to all appearances are without interest in the affairs of the parties. Counsel's argument to discredit them is that as Marinella saw Mrs. Cummings at night time only, his identification in court after a lapse of two or three years was forced. But what of Daly who saw them in daylight, identifies them, and of Cummings? Is it at all likely that Cummings would have pursued another woman mistakenly or purposefully to make a case?

"Cummings then hired the Corbally Detective Agency of Newark. One of the officers and three of the operatives of

the agency and Cummings testify to what they saw of the occurrences on the night of August 23d and the early morning of August 24th. Galgano and Cox, two of the operatives, followed Grimm and Mrs. Cummings from the Newark post office, where they met, to Dreamland Park (Mrs. Cummings from her home to the post office). Leaving the park towards midnight the two boarded a bus to Broad and Market streets and went to the Royal Chinese Restaurant on Market street. From there they took a taxicab to Belleville, in the neighborhood of Mrs. Cummings' home. The two walked through several streets until they stopped at a tree in front of a vacant lot where they stood close together for more than a hour until two in the morning and, according to Galgano, mouth to mouth, kissing. Cox, with Galgano, shadowed them to the park, to the restaurant and in the taxicab to where they got out of the taxicab in Belleville. He did not follow them nor again see them but appears to have waited at that point for Mr. Cummings whom Corbally had gone to fetch. Stephen Flarity, an officer of the Corbally agency, came upon the scene in Belleville. He saw the two at the tree, but was unable to recognize Mrs. Cummings in the dark. He, however, knew it was Grimm because when the two parted he followed him to a restaurant in Newark and then to Grimm's home. Frank Corbally followed the pair from the restaurant to Belleville, saw them at the tree but was unable to identify them; he brought Cummings there to witness the happenings. Cummings' testimony is that he observed the two under the tree: that is, he was told the two figures were his wife and Grimm.

"Galgano and Cox had trailed the two on the Saturday before, August 16th, from Newark to Coney Island. They followed Mrs. Cummings from her home, accompanied by a girl friend. At the Newark post office the two women met Grimm and another man. The four went by trolley to Elizabethport and ferry to Coney Island. On the island, Galgana stopped to telephone and lost track of them and Cox. Cox kept them in view and took them back to Elizabethport at eleven-forty-five. He was aboard the same trolley as far

as Dreamland Park from where he followed the trolley in a taxicab until they got off in Belleville and walked to Mrs. Cummings' home. Both witnesses describe the displays of affection they witnessed on the boat between the two couples.

"On August 29th Galgano and Cox followed Mrs. Cummings from her home to Newark on a trolley. She met Grimm at the post office and the two went to Dreamland Park where they left about ten at night. Returning to Belleville in a trolley they sauntered the streets and stopped at a telegraph pole alongside a cemetery; there they stood for a spell, kissing Galgano says, talking Corbally says. Flarity and Corbally had been notified and were stationed near where the pair got off the trolley. Flarity and Galgano raced around and through the cemetery to get closer but by the time they reached the point Grimm and Mrs. Cummings had gone. Corbally says Grimm left her at her street. Cummings also testified to seeing the two at the place.

"Mrs. Cummings and Grimm flatly deny ever being together in Dreamland Park or Coney Island and of course deny the events that ensued as just related. This denial and the general unreliability of detective testimony is urged to discredit the evidence that points to guilt. Testimony from such source is of course always to be carefully scrutinized and cautiously accepted, but subject to that test and guard, it is not to be disregarded and if belief in its truth is induced by the attending circumstances, it must be given due weight. The Corbally agency is regarded in Newark as dependable. Its general reputation for integrity is good and counsel himself vouches for this by his statement that he has 'no doubt whatever that Flarity and Corbally followed a man and a woman as Flarity and Corbally describe,' in the early morning of August 24th.

"And I haven't the slightest doubt that the man was Grimm, for, as Flarity says he trailed him to a restaurant, where he had opportunity to see him, and then to 401 Warren street where Grimm entered. That was Grimm's home (he says it was 391 or 397). The trail that led from the tree in Belleville to his home in Warren street is convincing of

his identity. Nor is there any doubt in my mind that the woman with him was Mrs. Cummings. While Flarity and Corbally were not able to recognize Mrs. Cummings and Grimm in the dark, Galgano and Cox knew them well. Their work was to shadow Mrs. Cummings: that was their assignment. They had shadowed her the week before from her home to Coney Island and the week after August 29th to Dreamland Park and back to Belleville. On August 23d they picked her up at her house and trailed her with Grimm to Dreamland Park and back to the restaurant on Market street, and thence to Belleville. Locating the two in the restaurant, they got in touch with Corbally and Flarity (as they did again the week after) who saw them later in Belleville. The calls for their employer to witness, give assurances that they had the woman they were set to watch. If they were falsely pretending, that could have been brought about only by Galgano and Cox knowingly following another woman and imposing her on their employer. But where could they so conveniently, upon the two occasions, have picked up Grimm, who unquestionably was the man in the case? And if they were imposing, why the trailing of Mrs. Cummings on the three occasions directly from her home? Why the efforts? And how did it come about that they were able to deliver their quarry always in Belleville for their employer's observation? I have no question of the good faith and entire accuracy of Cox's testimony. At the time of the hearing he was no longer a detective, having taken up the management of an industry. He testified in a wholly disinterested manner and strictly to the point of his own observations. He is unassailable except by the fact that he was once a detective. As to his truthfulness I have not the least doubt. Galgano is said to have been overzealous in that he says that Grimm and Mrs. Cummings were hugging and kissing under the tree and at the telegraph pole alongside the cemetery, which the others say they could not see for darkness. If the two were not doing worse at two in the morning, Galgano's description fits into the situation. The force of his testimony is that the two were there at an unconven-

tional hour and it is fair surmise that they were not discussing moral uplift. I have no question as to his truthfulness, nor of Flarity and Corbally. The testimony of the four is persuasive, and while one cannot point to a certain time and place of adultery, the established circumstances are compelling that the relation between the two are unholy.

"The testimony is also strongly corroborative of the proof of adultery on August 7th. The denial of guilt by the two is of as little weight as is their denial of being together at Dreamland Park, a fact sworn to by Galgano and Cox, Cummings, Daly and Marinella and by the chief in charge of the special police at the park, Cerone, who identified the two at the hearings as the pair he saw at the park, his attention having been called to their presence by Galgano while working on the case. I am persuaded to believe that the six are not perjurers and that the denials of Mrs. Cummings and Grimm were in self-defense. Mrs. Cummings did not hesitate to deny writing a letter to her husband which she apparently feared might hurt her defense. Misspelling of a single word which she again misspelled on the stand—'hear' for 'here'—satisfied me that her denial was untrue.

"Mistaken identity is suggested to perplex. It is said that Grimm had a sweetheart living in Belleville with whom he had been to Dreamland Park. Grimm does not say she was his companion under the tree.

"To discredit the four detectives, it is claimed that Mrs. Cummings was at work in the bakery of the A. & P. Company on Friday night, August 29th, when they say she was with Grimm at a telegraph pole near the cemetery, and the books of the concern would seem to bear out the claim. Mrs. Cummings did not work Saturday nights. August 16th and 23d were Saturdays. August 29th was Friday. There may be error as to date but not of the occurrence. Cox and Galgano trailed Mrs. Cummings from her home that day, it may have been Saturday, the 30th, and Flarity and Corbally sustain them, that the trail led to the cemetery.

"The Young charge. There is no appeal, as I read the petition, from the decree dismissing the Young charges, and

although I am not convinced of the commission of sin with him, the proof relating to that accusation has a strong bearing upon the case made against the defendant of adultery with Grimm; it tends to satisfying one of the truth of the evidence of guilt with Grimm.

"The incriminating evidence of adultery with Young was furnished by three women detectives, the Kopp sisters, who worked partly on a contingent basis—no proof, no pay. I have little confidence in them. They impressed me as unrestrained in conscience to accomplish their end and in relating crucial situations I feel that they drew on their fancies rather than the facts to paint the evil picture. That Young paid Mrs. Cummings ardent attention, was unseemly familiar with her, and that the two were not infrequently alone and in places they deny being, I haven't the least question, for it is testified to by witnesses I have no reasons to doubt. The evidence tends to arouse suspicion, but I am unwilling to accept as true the testimony of the Kopp sisters and their friend, Rothstein, of the occurrence on August 30th, 1925, which, if true, would unmistakably point to guilt on that night. They (the Kopp sisters) had trailed the two—Young and Mrs. Cummings—on four or five previous occasions, when, as they testify, they saw undue familiarity between the two, on the streets, at her home and Young's home where Mrs. Cummings was a welcome visitor, according to Young's mother and sister. On the night in question, according to the Kopp sisters, Young and Mrs. Cummings were at a Newark theatre where their lover-like conduct annoyed others. After the show they went to a chop suey restaurant and near midnight left and after meandering through the Chinese district of Newark, took a bus and after that a trolley to reach Mrs. Cummings' home, at one in the morning. There, according to the Kopp sisters, they went on the porch and then to bushes alongside the house, from which they emerged fifteen minutes later, Mrs. Cummings adjusting her clothes. Young kissed her good-night, and on his way down the street adjusted his belt or something on his trousers. Another night later, and later at night, they say, Young took Mrs.

Cummings and her child home; that the child was put in the house and they stayed on the porch. The insinuation in that they had illicit relations, because the witnesses say they saw the white of Mrs. Cummings' underskirt. I am not unwilling to accept their testimony as to the meanderings of Young and Mrs. Cummings the first night, their conduct in the theatre, their call at the restaurant and their return home late in the night, for it is supported in a measure by a taxi driver, who to all appearance, is disinterested. Ackerman, the taxi driver, was hired by the Kopp sisters, who picked them up casually on the street, to carry them in their pursuit of the pair who were riding to Belleville, first in a bus then a trolley. He was at pains that night to get a view of them and testified that in the trolley Young had his arm around Mrs. Cummings' neck. The Kopp sisters' testimony of familiarity of the two also finds some support in the proof of similar occurrences on other occasions testified to by other witnesses whom I have no reason to doubt, but I am unwilling to believe as true the alleged porch happenings on either night, for it is highly improbable that the two would misconduct themselves in the presence of Mrs. Cummings' sister-in-law who was in her bedroom which faces on the porch. The house is small. The sister-in-law occupied the first floor and Mrs. Cummings the second with her mother. The porch extended across the first story front. The sister-in-law's and the mother's evidence indicates the improbability of the occurrences, that they could not have taken place without their knowledge, and it is not believable that the two, Mrs. Cummings and Young, cast aside all precaution, and, of all places, selected the one that would most likely lead to detection and their undoing. I decline to believe the defendant guilty of adultery with Young on this questionable testimony. I must also withhold credence to the testimony of opportunity to commit adultery in Young's home. It is to the effect that on more than one night the two were in Young's home in the dark while the rest of the family were out temporarily and that they at times were in each other's embrace, kissing. It is not credited because some of the incidents related would

seem to have been impossible of observation and Young and his parents' and sister's testimony refute it.

"Another episode testified to by the women detectives is that one night while Mrs. Young and her daughter were in a delicatessen store, Mrs. Cummings and Young, who had accompanied them, remained outside where Young embraced and kissed Mrs. Cummings and when he took her home kissed her good-night. This is not unlikely because there is evidence from others of like happenings.

"Mrs. Cummings makes a sweeping denial of ever being out alone with Young. Its untruth is proved beyond question. Kaiser, a fireman, fellow workman of Cummings, followed the two in his car, at Cummings' solicitation. It was night time. He says he saw them stop in a dark spot in the road, embrace and kiss. Harold Doughty, a fireman, saw Mrs. Cummings with Young, alone, in a booth of a Chinese restaurant on Broad street, and John F. Smith, a cousin of Mrs. Cummings, says he met the two on Broad street at eleven-twenty o'clock at night on two occasions. Other witnesses testified to seeing them together on the street with the Cummings child. Cummings had the right of visit by the child and it appears that Young was frequently her companion when she took the child to meet her father at the library in Newark in the early evening; waiting for her until the visit was over.

"The charge of adultery with Grimm is made. The testimony to establish adultery with Young fails.

"The wife charges the husband with extreme cruelty. They were married during the war period. The husband was drafted into the service and went abroad and was released at Wrightstown in 1918 or 1919. They lived together until April, 1923. The testimony discloses that he at no time sensed his duty of a husband; he certainly never discharged it. When he returned from the war the wife had some difficulty in persuading him to return to her. He didn't want to go home with her. His support of her was meagre. His conduct, his vile epithets and actual physical violence from time to time, were past endurance and she left. He struck her, he beat her. He admits one assault. He said he had to

knock her down because she came at him with a knife. I am not satisfied with that explanation. That he was always ready with an abusive and vile tongue; that he had nothing but malice and bitterness in his heart toward her; that he wanted to be rid of her and threatened to kill her and that he was ever ready with his first is proved to a certainty. The testimony, of course, is mainly Mrs. Cummings', but it is amply corroborated. They had an argument over some property the day she left and he struck her two or three times. After she left him she returned to the house several times, and on two of the trips he beat her and threatened her with a gun if she did not get out. In the cold midwinter, February, 1924, while she was living with her mother, he carried away their undressed baby and when his wife resisted, struck her in the face. His conduct shows beyond peradventure that he did not want his wife; that he so abused her verbally and physically that she was compelled to leave. He is guilty of extreme cruelty. That she solicited a reunion does not mitigate against her nor weaken the proof of his cruelty. To again endure his abuse in the hope of an abatement was a lesser hardship than the separation she had involuntarily chosen for herself and baby. He turned down her appeal.

"The recrimination results in a dismissal of the petition and counter-claim."

*Mr. Owen Cummings,* for the petitioner-appellant, respondent, *per se.*

*Mr. Merritt Lane,* for the defendant-appellant, respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the conclusions of Vice-Chancellor Backes.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ. 15.

*For reversal*—None.